473 So.2d 73 (1985)
Lester J. MONTEGUT, Jr.
v.
Shelby W. DAVIS.
No. 85-CA-43.
Court of Appeal of Louisiana, Fifth Circuit.
May 13, 1985.
Rehearing Denied August 16, 1985.
*74 Accardo, Edrington, Leblanc & Golden, George Ann Hayne Graugnard, and Jules A. Carville, III, LaPlace, for plaintiff-appellee-appellant.
Davidson, Meaux, Sonnier & McElligott, James J. Davidson, III, Lafayette, for defendant-appellant.
Before CHEHARDY, GAUDIN and GRISBAUM, JJ.
CHEHARDY, Judge.
This is a suit to rescind two sales of immovable property for lesion beyond moiety. Both parties have appealed.
Lester J. Montegut Jr. sued Shelby Davis, his brother-in-law, to rescind two sales encompassing a one-third undivided interest in approximately 93½ acres of land in St. John the Baptist Parish. Montegut had inherited a one-third interest in the property from his parents. The land, part of a greater tract formerly known as Elvina *75 Plantation which was subdivided into seven long narrow strips through partition of a succession, runs from the east bank of the Mississippi River northeastward to about the 80-arpent line. The property measures approximately 262 feet in width by a depth of approximately 13,400 feet. Its net total acreage, excluding batture and servitudes, is 93.328 acres. The tract is situated on the outskirts of the community of Laplace, about one mile east of the junction of U.S. Highway 51 and U.S. Highway 61 (the latter known as Airline Highway).
In his petition plaintiff alleged lesion beyond moiety. Alternatively, he asserted the sales were void for lack of capacity, alleging he was temporarily deranged at the time of the sales and/or that defendant unduly influenced him to enter into the sales.
The first act of sale, dated March 23, 1981, transferred plaintiff's one-third interest in 76% of the property (acquired from his father's succession) for a recited consideration in the amount of $10,000.00 "and other good and valuable consideration." In the second sale, dated August 18, 1981, plaintiff transferred his one-third interest in the remaining 24% of the property (inherited from his mother) for a recited consideration of $5,000 "and other good and valuable consideration." Testimony at trial established conclusively that the actual total amount plaintiff received from defendant for both sales was $40,000.
The case was taken under advisement on August 26, 1983 following submission of post-trial memoranda from counsel. In a judgment rendered on June 29, 1984 the trial judge concluded that the value of the property at the time of the sales was clearly over $80,000 and therefore the sale was lesionary. The court adopted the testimony of plaintiff's expert witness, concluding the value of plaintiff's interest in the property at the time of the sale was $200,000. The court stated that based upon this finding, it expressed no opinion on the alternative bases for plaintiff's attack on the sale.
Plaintiff filed a motion for amendment of judgment and/or for partial new trial. The trial court granted the motion and on October 17, 1984 issued an amended judgment in which the property made the basis of the suit is particularly described and the defendant is ordered to make his election whether to restore the property or to supplement the price within 60 days after rendition of a final nonappealable judgment. In all other respects plaintiff's motion was denied.
Upon joint motion by the parties, the judgment was amended again on October 25, 1984 to correct several clerical errors in the property descriptions. From that judgment both parties have appealed.
The following issues are raised: (1) whether the trial judge committed manifest error in finding the value of plaintiff's interest exceeded $80,000; (2) if the sale is determined to be lesionary, whether the case should be remanded for a hearing to determine the value of the income received by defendant from agricultural and mineral leases on the property or, in the event defendant elects to supplement the price, the amount of interest due on the supplement; (3) alternatively, should this court find no lesion, plaintiff again raises the issues of lack of capacity and undue influence as grounds to void the sales.
The rescission of sales on account of lesion is covered by LSA-C.C. arts. 2589-2600. The following particularly concern this case.
"If the vendor has been aggrieved for more than half the value of an immovable estate by him sold, he has the right to demand the rescission of the sale, even in case he had expressly abandoned the right of claiming such rescission, and declared that he gave to the purchaser the surplus of the thing's value." Art. 2589.
"To ascertain whether there is a lesion beyond moiety, the immovable must be estimated according to the state in which it was, and the value which it had at the time of the sale * * *." Art. 2590.
"If it should appear that the immovable estate has been sold for less than one-half its just value, the purchaser may *76 either restore the thing and take back the price which he has paid, or make up the just price and keep the thing." Art. 2591.
"Should the purchaser prefer to keep the thing by making up the just price, he must pay the interest of the additional price from the day when the rescission was demanded. If he chooses rather to restore the thing and to receive the purchase money, he shall be liable to restore the fruits of the estate from the day of the demand, but the interest of his money shall also be paid to him from the same time." Art. 2592.
The only issue of fact to be decided in a suit to set aside a sale for lesion beyond moiety is whether the vendor has sold the immovable for less than half its value at the time of the sale. Foos v. Creaghan, 226 La. 619, 76 So.2d 907 (1954). The burden of proving lesion is upon the plaintiff, and he must establish his case by strong and convincing proof. Armwood v. Kennedy, 231 La. 102, 90 So.2d 793 (1956).
"[A] party attempting to set aside a sale must discharge the burden of proof incumbent upon him which requires that he prove the value of the property by clear and convincing evidence. The burden of proof is much more stringent in lesion cases than in expropriation cases. The evaluation may not be based on conjecture, possibility or speculation. However, the highest and best use of the property may be considered along with all other evidence of value so long as it tends to show `the value which it (the immovable) had at the time of the sale.' * * *"
Valley Land Corporation v. Fielder, 242 So.2d 358, 361 (La.App. 2 Cir.1970), writ denied, 257 La. 861, 244 So.2d 611. See also, Fletcher v. Smith, 216 So.2d 663 (La. App. 3 Cir.1968), writ denied, 253 La. 633, 219 So.2d 173; Mullins v. Page, 457 So.2d 64 (La.App. 2 Cir.1984); Rogers v. Read, 355 So.2d 46 (La.App. 2 Cir.1978); Martin v. Mays, 127 So.2d 77 (La.App. 1 Cir.1961).
In an action to rescind a sale for lesion beyond moiety, when there are great variances among appraisals, it is the court's function to examine each appraisal to determine which is more reasonable; the court is not bound to accept or reject one expert's testimony, but parts of each expert's testimony may be accepted when the testimony so accepted is based on proper facts and sound reasoning. Bisco v. Middleton, 383 So.2d 1047 (La.App. 1 Cir.1980).
The trial judge's assessment of testimony given by appraisers is entitled to great respect. Evergreen Plantation, Inc. v. Zunamon, 319 So.2d 543 (La.App. 2 Cir. 1975). Where the experts differ, the trial judge is in a better position to determine their credibility and the weight to be accorded their testimony and his decision as to the valuation of the property should not be disturbed on appeal unless shown to be manifestly erroneous. State, Department of Highways v. Wax, 295 So.2d 833 (La. App. 1 Cir.1974). The rule to establish value in lesion cases is not the highest value of comparable sales as in expropriation cases, but is more often the lowest or mean value of comparable sales. Weber v. Coppola, 176 So.2d 154 (La.App. 4 Cir. 1965). However, speculative values may not be considered in determining the market value of a particular piece of property. Mullins v. Page, 457 So.2d 64 (La.App. 2 Cir.1984).
As might be expected, the difficulty in this case arises from the vastly differing valuations placed on the property by the parties' expert witnesses. The district court stated in its reasons for judgment,
"Plaintiff's expert witness, Mr. Henry W. Tatje, III, valued the undivided one-third interest in the property at $200,000. Defendant's expert witness, Mr. Manning Riser, valued the undivided one-third interest at $38,500. The reason for the differing values is that Mr. Tatje found the best use of the property to be for residential purposes while Mr. Riser found the best use of the property to be for agricultural purposes. Defendants contend that Mr. Tatje was incorrect to evaluate the property based on a residential use and cite State Department of *77 Highways v. Talbot, 200 So.2d 97 (La. App. 1st Cir.1967), for the proposition that `if unimproved property is to be valued on the basis of residential development, there must be some reasonable expectation that the property will be used for that purpose in the not too distant future.' In light of the testimony concerning the development and growth of the area where this property is located, and this judge's own personal knowledge concerning the rapid residential development in the area at the time of the sale, there appears more than a reasonable expectation that this property will be used for residential development in the not too distant future. * * *"
As pointed out in both appraisers' reports, the greater portion of the land for many years has been used exclusively for sugarcane cultivation. At the north end of the property are approximately 21 acres of wooded swampland. At the south end is the batture, consisting of about 3 acres of unused overgrown land with approximately 260 linear feet of river frontage. Both appraisers considered the boom in population growth within St. John the Baptist Parish in recent years, but both noted that most of the new subdivision development has been westward, on the other side of Highway 51.
Plaintiff's appraiser, Henry Tatje, stated in his report,
"This area with the exception of one large residential development has remained largely unchanged over the past 10 years. It is a sparsely populated and developed area of La Place with a few pockets of commercial and residential development along U.S. Highway 61 and La. Highway 44 (River Road). The majority of the land in the area is vacant and undeveloped being either farmland or wooded between the Mississippi River and Interstate Highway 10.
* * * * * *
"The development trend in La Place over the past 2 to 5 years has clearly been in a westward direction from U.S. Highway 51 along U.S. Highway 61 away from the subject area. The old commercial area of La Place on U.S. Highway 61 in the subject area has been rather stagnate [sic] since the opening of Interstate Highway 10 and the vast majority of recent new development has been in the western part of the community."
Tatje noted that the subject area has a sizable amount of "vacant potentially developable" land, is "conveniently located to typical amenities" and felt it would attract considerable market interest if "properly developed." He added, nonetheless, "The strong westward development trend is, however, firmly seeded within this community. This does not mean that this area is considered inferior, but rather that its lack of overall development makes it somewhat less desirable than those areas west of U.S. Highway 51."
Tatje noted that according to its legal description, the property is two tracts, but it actually consists of three discernible parcels as seen by physical boundaries:
Parcel 1, consisting of 2.614 acres of front high land north of La. Highway 44 (River Road) and 262.15 linear feet of river batture having an undetermined area, mostly cleared, with some trees and undergrowth, along with some small old wood frame improvements, is generally level and at road grade with utilities available on River Road. It is the area south of a 50-foot road right-of-way shown on the survey map.
Parcel 2, consisting of approximately 20 acres of partially-cleared and partially-wooded land, measures about 265 feet wide by 3,400 feet long; it is the portion of the property north of the 50-foot road right-of-way and south of Airline Highway (U.S. Hwy. 61). It is generally level and below-grade of Airline Highway, with utilities available on the highway.
Parcel 3, consisting of approximately 70.714 acres, is all of the property north of the Airline Highway to the 80-arpent line. It measures about 280 feet wide on the highway widening to about 360 feet at the *78 north end, and is about 10,000 feet deep. About 80% of it is high, cleared cropland and 20% of it is wooded wetland, its elevation about 10 feet above mean sea level along Airline Highway lowering about five feet to the rear. Utilities are available along the highway.
Tatje based his appraisal on a "highest and best use" analysis, noting that this use must be "logical, likely, reasonably probable, and proximate and not such as is merely possible." Considering the differences in the three parcels of property he felt they have differing "highest and best uses."
He stated the highest and best use of Parcel 1 would be for barge mooring or fleeting on the batture area, with rural residential or light industrial use of the front land. He estimated the highest and best use of Parcel 2 is for plottage with adjoining sites for development purposes or to be subdivided as a residential subdivision. Further, the frontage along the Airline Highway has commercial potential. As to Parcel 3, the largest parcel, he felt that based on neighborhood trends the highest and best use is for subdivision for residential use or plottage with adjoining sites for major development, with commercial potential for the Airline Highway frontage.
He noted, however, that the parish currently has placed a moratorium on addition of new subdivisions to the parish sewerage system, so for any new developments the developer would have to supply sewerage capacity.
In estimating the value of the property Tatje used the market value approach, researching recent sales of comparable sites. He found two sales of batture sites comparable to Parcel 1, with prices for river frontage of $104 per linear foot and $250 per linear foot, and one sale of front land near the subject property for .44 per square foot.
Tatje concluded the estimated value of Parcel 1 is $89,000, allowing .44 per square foot for the 2.614 acres of front land and $150 per linear foot for the 262 linear feet of batture.
For Parcels 2 and 3 Tatje found eight sales of similar sites which had been developed into residential subdivisions. For Parcel 2 the most comparable sites were Sales 4 ($6,735/acre), 5 ($7,228/acre) and 8 ($9,200/acre). Allowing for the differences in those properties from Parcel 2, he estimated the market value of Parcel 2 would be $8,000/acre for a total of $160,000.
For Parcel 3 the most comparable sites were Sales 1A-1F, all purchases of similar long, narrow, vacant sites north of Airline Highway. Sales 1A, 1C, 1D and 1F were for $5,200/acre; Sales 1B and 1E were for $4,000/acre. The other sites, Sales 2 ($10,266/acre), 3 ($10,872/acre), 6 ($12,869/acre) and 7 ($11,669/acre), had shapes superior to the subject property's because they were much wider, with similar locations and with sewerage access. Based on these he estimated the market value of Parcel 3 at $6,000/acre, for a total of $425,000.
Tatje's total estimated value for the property, considered as three parcels, is $674,000. Allowing, however, for the requirement in this lawsuit that the tract be considered as a single saleable property, thus requiring discounting to entice a purchaser to buy the entire site, Tatje's final value estimate was $660,000. Because the ownership interest involved is an undivided one-third interest, however, Tatje allowed for a further 10% discount due to potential problems with other owners, etc., reaching a final amount of $197,980.20, which he rounded off to $200,000.
Defendant's expert appraiser, Manning Riser, arrived at a total value much lower than that assigned by Tatje. He reasoned that a change in use of the property was highly unlikely within the next seven to ten years. He felt acceptance as a residential subdivision was unlikely because of the limited availability of public utilities, the slow growth of residential development in the area as compared with the western side of Laplace, and what he felt was the improbability of agreement among the co-owners to sell.
*79 Riser stated that Elvina Plantation, of which the subject property is part, is the last plot of sugarcane on the east bank of the river in the lower part of the parish. The next growth is several miles upriver from the subject. He noted that there are fewer mills to grind sugarcane now and that the one mill remaining on the east bank was scheduled to be shut down. This would require the grower to transport all his cane over 30 miles, crossing the river, to have it ground. As a result, the agricultural lease, when renewed, would require the lessors to make allowances for a lower margin of profit by the grower-lessee.
Riser pointed out that the subject property, if developed alone, is too narrow to allow more than a one-street subdivision; accordingly, substantial development would require putting the subject tract together with adjoining tracts of Elvina Plantation. Based on information received during his appraisal he felt it was unlikely all the owners of the adjoining tracts would agree to sell to a developer. For similar reasons he felt commercial development of the batture and River Road-Airline Highway frontage was unlikely:
"Any commercial, industrial, or large-scale residential development would require more than the subject strip so it would necessitate agreement by a number of owners and acceptance by neighbors. It is doubtful if this will occur in the near future. Therefore, the indicated highest and best use would be renewal of the existing [agricultural] lease as the only immediate method of income to pay taxes on the property. In view of the above, it would also not be desirable to sell the possible lot at the Jefferson Highway as this would interrupt the property lines from the river and negate some possible use in the future for the total property of the subject and other owners of the total plantation acreage."
Considering the property's "highest and best use," therefore, to remain as acreage for sugarcane cultivation, he was able to find only 2 comparable sales. In the first, the cane land was valued at $1,650/acre and the swamp land at $600/acre. In the second, the land in cane cultivation was valued at $1,700/acre.
Based on these comparables, Riser appraised the cane land (72.628 acres) at $1,400/acre and the remaining land (26.85 acres comprised of swamp, batture and rights-of-way) at $600/acre. (He assigned no separate value to the batture area, for he felt the river frontage was too narrow to allow for any commercial mooring operation, requiring consolidation with other tracts to be commercially viable.) His total estimate under the Market Value Approach for the entire tract was $117,800.
The net annual operating income of the tract is approximately $5,872, which he converted under the Income Approach to valuation to a total tract value of $55,900. Reconciling this data with the market value data, he concluded the estimated fair market value of the whole property was $115,000. He divided this by three to arrive at his estimate of the value of plaintiff's one-third interest, $38,500.
On appeal, defendant asserts the evidence was insufficient to establish the amount "a willing buyer" would pay "a willing seller" (the definition of fair market value) because of the apparent inability of the Montegut family as a whole to agree on a plan for development of Elvina Plantation. Because the tract in question, a part of the plantation, is too narrow for more than a one-street subdivision, defendant contends a developer is unlikely to wish to buy that strip without the adjoining tracts, whose owners may present stumbling blocks. Davis argues, "If any one of the co-owners disagrees, then a willing seller does not exist for such a use, and the highest and best use of the property could only be for its present use, i.e., agricultural or farming purposes."
Defendant takes issue with the trial judge's statement, in his reasons for judgment, "In light of the testimony concerning the development and growth of the area where this property is located, and this judge's own personal knowledge concerning *80 the rapid residential development in the area at the time of the sale, there appears more than a reasonable expectation that this property will be used for residential development in the not too distant future." (Emphasis added.)
We cannot say the trial judge was manifestly erroneous in his conclusions. Although defendant in effect asserts that plaintiff's valuation of the property was speculative and conjectural, we do not find clear error in the record. Although there was evidence that some owners of other tracts within Elvina Plantation might be reluctant to sell, that did not negate the evidence they were interested in proposals made by a developer.
On the other hand, defendant's own expert noted that sugarcane production in the area has become less viable, so that Elvina Plantation has the only cane planted within miles. This negates defendant's assumption that the tract is likely to remain under sugarcane in the foreseeable future. The obvious trend in the area is toward commercial and residential development, even considering the fact that such development is slower in the immediate vicinity of the subject tract than it is upriver.
As to the trial judge's mention of his personal knowledge of the area, obviously it would have been improper for him to rely solely or even primarily on such knowledge. Local real estate trends and values are not a proper subject for judicial notice, nor is the judge's personal knowledge in evidence for this court to review. We conclude, however, that the judge's remark was intended simply to explain why he found plaintiff's expert more credible than defendant's. Obviously a judge cannot decide cases in a vacuum; we all must use our accumulated knowledge and experience in evaluating evidence and determining what makes one witness more believable than another. Under the circumstances, the judge's mention of his knowledge was harmless error if it was error at all.
Because we find no manifest error in the trial judge's conclusion that the sales were lesionary, we too find it unnecessary to address the issues of plaintiff's mental capacity or undue influence by defendant.
Finally, plaintiff's cross-appeal seeks to have a new trial as to the questions of an accounting for fruits of the property and/or interest owed on the supplemental price, depending on what election the defendant makes as to disposition of the property.
Defendant opposes any new evidence on these issues, arguing plaintiff had adequate opportunity during the original trial to elicit evidence concerning income received by Davis from the property since the sales in 1981. Further, states defendant, computation of interest due on any funds due is a simple mathematical calculation not requiring a court hearing.
We conclude that, should Davis elect to return the property and to receive back his purchase price, fairness requires there be an accounting by him for all income he received up to the date the property is returned. Should plaintiff disagree with the accounting, he can traverse it by means of a rule to show cause. Similarly, the interest due is merely a mathematical calculation, based on the legal rate of interest applicable at the relevant times. Any dispute can also be resolved by rule to show cause.
For the foregoing reasons, the judgment of the district court is amended to provide that, should defendant, Shelby Davis, elect to restore the subject property and receive the purchase money, he shall account for and restore to plaintiff the fruits of the estate from the date of judicial demand to the date the property is restored to plaintiff, pursuant to LSA-C.C. art. 2592. In all other respects, the judgment of the district court is affirmed. In compliance with LSA-C.C.P. art. 1919, we are required to include the property description in this judgment, therefore the judgment is recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, LESTER J. MONTEGUT JR., and against defendant, SHELBY W. DAVIS, *81 decreeing to be lesionary and subject to rescission the sales by plaintiff to defendant as shown in the Acts of Cash Sale, the first dated March 23, 1981 and recorded as Entry Number 76923, COB 150, Folio 725 in the records of St. John the Baptist Parish, the second dated August 18, 1981 and recorded as Entry Number 79438, COB 156, Folio 217 in the records of St. John the Baptist Parish, comprising the following described property:
A. An undivided one-third (1/3) of Seventysix (76%) Percent of the following-described property situated in the Parish of St. John the Baptist, State of Louisiana, to-wit:
Those TWO (2) CERTAIN LOTS OF GROUND, together with all the buildings and improvements thereon and all the rights, ways, privileges, servitudes and advantages thereunto belonging or in any wise appertaining, situated in Sections 29 and 62, T-11-S, R-7-E, and Section 62, T-11-S, R-8-E, in the Parish of St. John the Baptist, East of the Mississippi River at LaPlace, Louisiana, and more particularly designated on the Alternate Plan No. 2 for the Division of Elvina Plantation made by Landry Engineering Company, certified by S.K. Landry, C.E., dated May 15, 1959, and revised July 20, 1959, June 6, 1961 and July 20, 1961, and designated on said plan as Lots No. Six (6) and Six-A (6-A) of the Division of Elvina Plantation, and according thereto, said Lot Six (6) commences 1,294.35 feet from the upper or northern boundary of Elvina Plantation, being the division line between Lots 5 and 6, and a 50-foot private crossroad, the place of beginning, and thence measures 262.15 feet in width and front on said 50-foot private crossroad by a depth on its north sideline North 70 degrees 11'41" East 13,205.17 feet and a depth on its south or lower sideline North 70 degrees 36'19" East 13,143.75 feet and having a width at said depth of 359.98 feet, which lot contains 90.714 acres, all in accordance with the plan of Landry Engineering Company, certified by S.K. Landry, C.E., dated May 15, 1959, revised July 20, 1959, June 6, 1961 and July 20, 1961.
Lot Six-A (6-A) contains 2.614 acres, all in accordance with the plan of survey of Landry Engineering Company heretofore shown, which said lot of ground commences 1,292.52 feet South 21 degrees 52'14" East from the old grate bar located on the upper or northern boundary of the Elvina Plantation and thence measures 261.79 feet in width and front on a private 50-foot crossroad shown on said plan of survey, by all the depth thereunto belonging to the Jefferson Highway on the division line of Lots 5A and 6A, having a bearing measured from the Jefferson Highway North 70 degrees 11'41" East, and by all the depth thereunto belonging to the Jefferson Highway on its south sideline on the division line between Lots 6A and 7A, and having a bearing North 70 degrees 36'19" East measured from the Jefferson Highway, and is bounded North by Lot 5A, East by a 50-foot private roadway, South by Lot 7A and West by the Jefferson Highway. There is also specifically included to the owner of Lots Six (6) and Six-A (6-A), the fee title to that portion of the right-of-way of the 50-foot private crossroad, located in front of Lot 6 and Lot 6-A, between the prolongation of the north and south sidelines of Lot 6 to the rear boundary of Lot 6-A, together also with the fee title to the rights-of-ways of the I.C. Railroad, La. & Ark. RR, now the Kansas City Southern, and the Baton Rouge and New Orleans Airline Highway and the three-foot (3') strip of land for sidewalk, adjoining the Jefferson Highway, as shown on said plan of survey made by Landry Engineering Company, but subject to all valid existing servitudes of record affecting same; and together with all and including all alluvion, batture and sandbars, formed and attached thereto, as well as all accretion to said land by reliction and dereliction thereon and all additions to said land resulting from the changing of water courses or the opening of new channels between Lots 5 and 7, and shown on said *82 plan for the division of Elvina Plantation, made by Landry Engineering Company, from the east right-of-way line of the Jefferson Highway to the Mississippi River, at its mean level.
The above property, comprising 93.328 acres, having been acquired by Lester J. Montegut by Act of Partition dated May 5, 1962, recorded under Entry Number 24505, in Conveyance Book 47, Page 395, et seq. of the records of the Parish of St. John the Baptist, Louisiana, and the interest of Lester J. Montegut Jr. having been acquired by judgment of possession in the Succession of Lester J. Montegut, bearing Docket Number 8511 of the 16th Judicial District Court for the Parish of St. Martin, State of Louisiana, duly recorded in the Conveyance Records of the Parish of St. John the Baptist under Entry Number 64524, Conveyance Book 123, Folio 655 thereof.
The undivided one-third (1/3) of Seventysix (76%) Percent of all of the oil, gas and other minerals, and the mineral royalty rights and interest in, on and relating to the lands situated in Sections 28, 29, 62 and 63 of Township 11 South, Range 7 East and Township 11 South, Range 8 East, St. John the Baptist Parish, Louisiana, the real estate being more fully described in the Act of Partition of the surface of said lands, duly recorded under Entry Number 24505, Conveyance Book 47, Page 395 of the records of St. John the Baptist Parish, Louisiana. The interest herein sold having been acquired by the said Lester J. Montegut Jr. by inheritance from his father, Lester J. Montegut Sr., as per judgment recorded under Entry Number 64524, Conveyance Book 123, Folio 655 of the Conveyance Records of the Parish of St. John the Baptist.
B. The undivided one-third (1/3) of Twentyfour (24%) Percent of the following-described property situated in the Parish of St. John the Baptist, Louisiana, to-wit: Those TWO (2) CERTAIN LOTS OF GROUND, together with all the buildings and improvements thereon and all the rights, ways, privileges, servitudes and advantages thereunto belonging or in any wise appertaining, situated in Sections 29 and 62, T-11-S, R-7-E, and Section 62, T-11-S, R-8-E, in the Parish of St. John the Baptist, East of the Mississippi River at LaPlace, Louisiana, and more particularly designated on the Alternate Plan No. 2 for the Division of Elvina Plantation made by Landry Engineering Company, certified by S.K. Landry, C.E., dated May 15, 1959, and revised July 20, 1959, June 6, 1961 and July 20, 1961, and designated on said plan as Lots No. Six (6) and Six-A (6-A) of the Division of Elvina Plantation, and according thereto, said Lot Six (6) commences 1,294.35 feet from the upper or northern boundary of Elvina Plantation, being the division line between Lots 5 and 6, and a 50-foot private crossroad, the place of beginning, and thence measures 262.15 feet in width and front on said 50-foot private crossroad by a depth on its north sideline North 70 degrees 11'41" East 13,205.17 feet and a depth on its south or lower sideline North 70 degrees 36'19" East 13,143.75 feet and having a width at said depth of 359.98 feet, which lot contains 90.714 acres, all in accordance with the plan of Landry Engineering Company, certified by S.K. Landry, C.E., dated May 15, 1959, revised July 20, 1959, June 6, 1961 and July 20, 1961.
Lot Six-A (6-A) contains 2.614 acres, all in accordance with the plan of survey of Landry Engineering Company heretofore shown, which said lot of ground commences 1,292.52 feet South 21 degrees 52'14" East from the old grate bar located on the upper or northern boundary of the Elvina Plantation and thence measures 261.79 feet in width and front on a private 50-foot crossroad shown on said plan of survey, by all the depth thereunto belonging to the Jefferson Highway on the division line of Lots 5A and 6A, having a bearing measured from the Jefferson Highway North 70 degrees 11'41" East, and by all the depth thereunto belonging to the Jefferson Highway on its south sideline on the division line between *83 Lots 6A and 7A, and having a bearing North 70 degrees 36'19" East measured from the Jefferson Highway, and is bounded North by Lot 5A, East by a 50-foot private roadway, South by Lot 7A and West by the Jefferson Highway. There is also specifically included to the owner of Lots Six (6) and Six-A (6-A), the fee title to that portion of the right-of-way of the 50-foot private crossroad, located in front of Lot 6 and Lot 6-A, between the prolongation of the north and south sidelines of Lot 6 to the rear boundary of Lot 6-A, together also with the fee title to the rights-of-ways of the I.C. Railroad, La. & Ark. RR, now the Kansas City Southern, and the Baton Rouge and New Orleans Airline Highway and the three-foot (3') strip of land for sidewalk, adjoining the Jefferson Highway, as shown on said plan of survey made by Landry Engineering Company, but subject to all valid existing servitudes of record affecting same; and together with all and including all alluvion, batture and sandbars, formed and attached thereto, as well as all accretion to said land by reliction and dereliction thereon and all additions to said land resulting from the changing of water courses or the opening of new channels between Lots 5 and 7, and shown on said plan for the division of Elvina Plantation, made by Landry Engineering Company, from the east right-of-way line of the Jefferson Highway to the Mississippi River, at its mean level.
The above property, comprising 93.328 acres, having been acquired by Lester J. Montegut Jr. by judgment of possession rendered in the Succession of Carmen Bulliard, Widow of Lester J. Montegut, bearing Docket Number 8904 of the 16th Judicial District Court for the Parish of St. Martin, State of Louisiana, and duly recorded in the Conveyance Records of the Parish of St. Martin as Entry Number 200529, Conveyance Book 847, Folio 164, and the interest of Carmen Bulliard, Widow of Lester J. Montegut, having been acquired by judgment of possession rendered in the Succession of Lester J. Montegut, bearing Docket Number 8511 of the 16th Judicial District Court for the Parish of St. Martin, State of Louisiana, recorded as Entry Number 64524, COB 123, Folio 655 of the records of the Parish of St. John the Baptist, Louisiana.
The undivided one-third (1/3) of Twentyfour (24%) Percent of all of the oil, gas and other minerals, and the mineral royalty rights and interest in, on and relating to the lands situated in Sections 28, 29, 62 and 63 of Township 11 South, Range 7 East and Township 11 South, Range 8 East, St. John the Baptist Parish, Louisiana, the real estate being more fully described in the Act of Partition of the surface of said lands, duly recorded under Entry Number 24505, Conveyance Book 47 at Page 395 of the records of St. John the Baptist Parish, Louisiana. The interest herein sold having been acquired by the said Lester J. Montegut Jr. by judgment of possession rendered in the Succession of Carmen Bulliard, Widow of Lester J. Montegut, bearing Docket Number 8904 of the 16th Judicial District Court for the Parish of St. Martin, State of Louisiana, and duly recorded in the Conveyance Records of the Parish of St. Martin in Conveyance Book 847, Folio 164, Entry Number 200529, and the interest of Carmen Bulliard, Widow of Lester J. Montegut, having been acquired by judgment of possession rendered in the Succession of Lester J. Montegut, bearing Docket Number 8511 of the 16th Judicial District Court for the Parish of St. Martin, State of Louisiana, and recorded under Entry Number 64524, COB 123, Folio 655 of the records of St. John the Baptist Parish, Louisiana.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the true value of the undivided interests sold by plaintiff, LESTER J. MONTEGUT JR., to defendant, SHELBY W. DAVIS, by virtue of the Acts of Cash Sale, the first dated March 23, 1981 and recorded as Entry Number 76923, COB 150, Folio 725 in the records of St. John the Baptist Parish, the second dated August 18, 1981 and recorded *84 as Entry Number 79438, COB 156, Folio 217 in the records of St. John the Baptist Parish, is TWO HUNDRED THOUSAND AND NO HUNDREDTHS ($200,000) DOLLARS.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant, SHELBY W. DAVIS, make his election either to restore the property or to supplement the price, pursuant to LSA-C.C. art. 2591, within sixty (60) days after rendition of a nonappealable final judgment in this matter.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that in the event defendant, SHELBY W. DAVIS, elects to restore the property to plaintiff and to receive back his purchase price, he is hereby ordered to account for and to restore to the plaintiff, LESTER J. MONTEGUT JR., the fruits of the estate from the date of judicial demand to the date the property is restored to plaintiff, pursuant to LSA-C.C. art. 2592.
Costs of this appeal are assessed against defendant, SHELBY W. DAVIS.
AFFIRMED, AMENDED AND RECAST